Naylor *v*. Eagle.

5-1298                                          303 S. W. 2d 239

Opinion delivered June 17, 1957.

*Wood & Smith,* for appellant.

*Albert G. Sexton* and *Edwin E. Dunaway,* for appellee.

J. Seaborn Holt, Associate Justice. This litigation involves alleged damages growing out of the existence of a dam and concrete spillway across the mouth of Fishtrap Slough, a short distance upstream from its juncture with Bayou Meto in Lonoke County. Appellant, Jack Naylor, as owner of a large tract of farm land some three miles upstream and north of the dam, within the watershed of Fishtrap Slough, [and the other appellants as his tenants] sued appellee, Eagle, for damages allegedly

caused by overflow backwaters from said dam and asked for a mandatory injunction requiring appellee to remove the dam. Appellants alleged in their complaint that the above farm land ''adjoins a natural drain, improved by dredging in 1922, known as Fishtrap Slough, which generally parallels Bayou Meto, . . . 3. that Eagle is owner of a 40-acre tract at the junction of Bayou Meto and Fishtrap Slough. He has constructed on Fishtrap Slough near such point a concrete dam which obstructs the natural drainage and raises the water level above by several feet. The effect has been to cause an impoundment of water on the land of plaintiffs, upper proprietors, and make planting and cultivation impossible in some areas and to greatly increase cost and reduce yield in others. Despite notice of the damage caused and which will continue as long as the dam is permitted to remain, defendant has refused to remove or lower the dam. Future damage will occur unless defendant is enjoined from maintaining the dam and plaintiffs have no adequate legal remedy. 4. As a direct result of the dam's presence water remained on plaintiff's land until the latter part of July, having risen in the latter part of May after some crops had already been planted and had come up, causing loss of the planted crops and reduced yield in others. Specifically plaintiffs have suffered the following damage.''

Appellee answered with a general denial and also pleaded the 3-year statute of limitations as a bar. Trial resulted in a decree in favor of appellee on all issues, and this appeal followed.

For reversal appellants first contend that the court erred in holding that the action was barred by limitations. We agree with appellants' contention on this point. It appears that this dam in question was installed in May 1952. Appellants concede that the chancellor's finding that it was so erected is not against the preponderance of the testimony. The present suit was filed December 13, 1955. This installation date, however, in the circumstances is not material. Unless it should appear that the obstruction caused by the dam was of such

nature that its effect must have been apparent with reasonable certainty, then limitations would not begin to run on an action for damages until such damages actually occurred.

Our governing rule in cases such as this has been many times stated by this court. In *Missouri Pacific R. R. Company* v. *Holman*, 204 Ark. 11, 160 S. W. 2d 499, we said: "Upon consideration of the question as to the application of the statute of limitation to these overflow cases, the permanency of the structure or obstruction impeding the flow of water is not the controlling question. Indeed, the question cannot arise unless the obstruction is of a permanent nature, but its permanency does not of itself determine whether the damages, which result from its erection, are original or recurring. If it is of such a construction as that damage must necessarily result, and the certainty, nature and the extent of this damage may be reasonably ascertained and estimated at the time of its construction, then the damage is original and there can be but a single recovery, and the statute of limitations against such cause of action is set in motion on the completion of the obstruction. If it is known merely that damage is probable, or, that even though some damage is certain, the nature and extent of that damage cannot be reasonably known and fairly estimated, but would be only speculative and conjectural, then the statute of limitations is not set in motion until the injury occurs, and there may be as many successive recoveries as there are injuries."

Here we think the preponderance of the evidence showed the damages were probable and their nature and extent could not be reasonably known and estimated at the time the dam was built. Appellee himself so testified, in effect. "Q. When you installed the last concrete spillway was it reasonably certain that the installation of that spillway would cause the damage that has resulted here? . . . A. No, sir. . . . Q. So the presence of the spillway from the very beginning of the time this last one was put there was not known to you or anyone else that it would cause any damage, was it? A. No, sir." There

was also the testimony that appellant's farm was some three miles upstream and after the dam was built the weather up to May 1955 had been unusually dry and the rainfall insufficient to test the flooding effect of the dam.

Appellants next argue that: ''The chancellor erroneously held that appellee could obstruct a natural drain when the effect, according to the undisputed testimony of the engineer [Crist] who testified for appellants, was to materially retard drainage off the Fishtrap Slough watershed. Under decisions of this court a determination of the technical aspects of drainage is restricted to the testimony of experts. Since the testimony of appellants' expert is undisputed the chancellor's decision is against a clear preponderance of the evidence,'' and that appellants were entitled to crop damages. We have concluded, after carefully reviewing all the testimony, that the chancellor's finding on this issue, to the effect that the dam did not cause the damages claimed by appellants, is not against the preponderance thereof.

There is no dispute here as to the applicable law in cases of this nature. It appears well settled by our decisions that one riparian owner along a non-navigable stream has no right to obstruct the natural flow of said stream to the detriment or damage of other riparian owners. *DeVore Farms, Inc.* v. *Butler Hunting Club, Inc.*, 225 Ark. 818, 286 S. W. 2d 491. The question, whether appellee's dam flooded appellants' land to their damage, is purely factual. To sustain their contention of flood damage, appellants lean heavily on the testimony of their engineer, Crist, and argue that his is the only competent testimony ''on the issue of whether the dam obstructs Fishtrap Slough to such an extent that appellants' land was flooded and damaged by the rain that fell May 26 and 27, 1955.'' We do not agree that the testimony in this case must be confined to that of this engineer. We have many times announced the rule that the testimony and opinion of lay witnesses, non-experts, is competent when the witness lays a proper foundation by stating facts and observations upon which his opinion is based.

We said in *Burdine* v. *Partee Flooring Mill,* 218 Ark. 60, 234 S. W. 2d 193, "Moreover, were it conceded that all the expert witnesses introduced in the case agreed upon conclusions as argued by appellant, the jury would not necessarily have to so find the facts to be, because such testimony may be controverted by any other competent evidence. *St. Paul Fire & Marine Ins. Co.* v. *Green,* 181 Ark. 1096, 29 S. W. 2d 304. Not only this, but, were it conceded that all the expert testimony offered by both parties was in full accord and agreement and not contradicted by any other expert evidence, yet the jury would not be bound by such testimony. 11 R. C. L., 586, states the rule as follows: 'Even if several competent experts concur in their opinion, and no opposing expert evidence is offered, the jury are still bound to decide the issue upon their own fair judgment.' *Arkansas Power & Light Co.* v. *Bollen,* 199 Ark. 566, 134 S. W. 2d 585.'' There was much testimony from lay witnesses, on behalf of appellee, tending to contradict Crist. Appellee Eagle testified that he, together with the Lonoke County Surveyor, had gone all around Fishtrap Slough and had determined the water level and that the dam had not caused any damages to property owners. In this connection he testified: "A. I waited until the water went down within its channel. I don't know anything about 206 and things like that, but I know that no engineer can beat a water level, so I walked the level in the woods. All of this was in woods back in there then and it has all been cleared up since then, most of it. I walked it and I had a 22 and I would mark it at the water ledge and I would later after I marked it—I called that a bench mark, I don't call the stobs a bench mark, I call a hack in a tree, the old fashioned country way is the only way I know about these levels, so I marked it with a water level. Later I confirmed it with shots that our county surveyor put there for me.''

Ben Daniels testified: "Q. Is your farm between Mr. Eagle's dam and spillway and Mr. Naylor's farm and both adjoining Fishtrap Slough? A. Yes, sir, I am west of Mr. Naylor's. Q. But your property is adjacent to or joins on to Fishtrap Slough? A. Yes, sir. Q. And

the water that affects you would affect him or vice versa? A. Yes, sir. Q. Mr. Daniels, how much crop did you make on your rice or how many bushels per acre in 1955, after that water went off of it? A. Well, approximately one hundred bushels to the acre.''

Jeff Cates, another farmer who owns land adjacent to Fishtrap Slough and between the dam and Naylor's property, testified, in effect, that the water got higher than the fence posts following the big rain in 1955; that there is very little difference in the elevations of the lands in the Fishtrap Slough basin away from Bayou Meto down to the mouth of Fishtrap Slough and land up above; that in this area the lands are similarly situated and there is a difference of about 2 feet or 3 feet only in elevation; that the land slopes slightly and gradually south towards Bayou Meto and Fishtrap Slough. He further testified, in effect, as did several other witnesses owning lands in between that of appellants and appellee, that he had not been damaged by the presence of the spillway and made normal crops in 1955. There was other testimony to the effect that every year water backs out of Bayou Meto and floods the country for several miles north of appellee's dam and spillway.

As indicated, while the testimony of the engineer, Crist, tended to contradict appellee's witnesses and without attempting to detail the testimony further, we have concluded that the chancellor's findings are not against the preponderance of the evidence. Accordingly, we affirm.