593 A.2d 1314

Dwight GRAYBILL, Appellant,

v.

PROVIDENCE TOWNSHIP, Kenneth Harold Findley, Carol Ann Findley, Earl Bachman, Kelly F. Bachman, Edward Ivan Bachman, and Cathy J. Bachman, Appellees.

Commonwealth Court of Pennsylvania.

Submitted on Briefs March 6, 1991.

Decided June 24, 1991.

Melvin H. Hess, Lancaster, for appellant.

James D. Hagelgans, Lancaster, for appellees.

Before CRAIG, President Judge, and DOYLE, COLINS, PALLADINO, MCGINLEY, SMITH and PELLEGRINI, JJ.

CRAIG, President Judge.

In this appeal from the order of the Court of Common Pleas of Lancaster County, granting summary judgment in favor of the defendants, Providence Township, Kenneth Harold Findley and Carol Ann Findley, and Earl Bachman, Kelly F. Bachman, Edward Ivan Bachman and Cathy J. Bachman, and entering judgment against the plaintiff, Dwight Graybill, this court must reexamine our decision in *Leggieri v. Township of Haverford,* 98 Pa.Commonwealth Ct. 646, 511 A.2d 955 (1986).

Graybill filed a complaint against the defendants seeking compensatory damages and equitable relief for a flooding condition that developed on his property which he alleges was caused by the defendants' conduct. The trial court granted summary judgment in favor of the defendants based upon the conclusion that the plaintiff's cause of action was barred by the statute of limitations. On appeal, Graybill challenges that conclusion.

## 1. Factual history

The pleadings, depositions and interrogatories, reveal the following facts and history. The Findleys owned a tract of land located on Scheller Road in the township. On July 28, 1980, the Findleys obtained approval of the Lancaster County Planning Commission for subdivision of their land into

Lots Nos. 30A, 31, 32, 33, 34, 35, and 36, as shown on the Tax Map, and built three houses on three of the lots by 1983. Graybill owns property located on Scheller Road at the bottom of the hill below the Findleys' subdivided lots. The Bachmans purchased Lot No. 36 on March 4, 1983 from the Findleys, subdivided it into two lots and built two houses on those lots in 1987. Paragraph 10 of Complaint and Bachmans' Answer and New Matter; Bachmans' Answer to Graybill's Interrogatories Nos. 1–2, 4.

On December 7, 1987, Graybill filed an action against the defendants seeking damages that allegedly resulted from flooding on his property caused by the subdivision and development of the Findleys' lots. However, Graybill averred that he was seeking damages resulting from the continuing inundation of his property only "between November of 1986 and August of 1987." Paragraph 24 of Complaint. Graybill also requested a permanent injunction to prevent the defendants from causing further damage to his property. (Counts 2, 4, 6, 8, 10, 12, 14 and 16 of Complaint.)

Graybill alleged that the Findleys were negligent (1) in failing to provide effective drainage of surface water when subdividing their land (Count 1); (2) in failing to obtain his written approval for disposal of stormwater as required by section 608.01.3 of the Lancaster County Subdivision and Land Development Ordinance (Count 3) [1]; (3) in removing a fence row from Lot Nos. 1 and 3 in October or November, 1986, which allegedly increased flooding of his property (Count 5); and (4) in violating Section 680.13 of the Storm Water Management Act, Act of October 4, 1978, P.L. 864, 32 P.S. § 680.13 (Count 7).[2]

1. Section 608.01.3 of the Ordinance provides:
   Whenever a development disposes storm water runoff to an adjacent property not within a natural water course or in a manner which exceeds the capability of a water course, approval of the affected owners shall be obtained in writing and a copy filed with the Commission and recorded with the Lancaster County Recorder of Deeds. It is the responsibility of the applicant and/or designer to identify these areas.

2. Section 13 of the Storm Water Management Act provides:

Graybill alleged that the township was negligent as follows: (1) authorizing the installation of a storm water drainage pipe which conveyed the drainage of water from the new houses to the existing pipe, allegedly causing increase of water flow onto his property (Count 9); (2) failing to take remedial action to correct the storm water drainage system (Count 11); and (3) failing properly to inspect and monitor the development and grading of the subdivided lots pursuant to the township's Storm Water Management Ordinance (Count 13). Graybill further alleged that the Bachmans were negligent in changing the quantity of surface water flowing onto his property (Count 15).

In their new matter, the defendants asserted the affirmative defense of the statute of limitations. The Findleys additionally asserted laches as to Graybill's request for equitable relief. After the close of pleadings and completion of discovery, the defendants filed motions for summary judgment, one basis of which was that the two-year statute of limitations barred the action.[3] The trial court agreed and

Any landowner and any person engaged in the alteration or development of land which may affect storm water runoff characteristics shall implement such measures consistent with the provisions of the applicable watershed storm water plan as are reasonably necessary to prevent injury to health, safety or other property. Such measures shall include such actions as are required:

(1) to assure that the maximum rate of storm water runoff is no greater after development than prior to development activities; or

(2) to manage the quantity, velocity and direction of resulting storm water runoff in a manner which otherwise adequately protects health and property from possible injury.

3. The Findleys and Bachmans based their motions for summary judgment additionally upon Graybill's failure to set forth sufficient facts to show their duty owed to Graybill. The township in its motion alleged the additional defense of governmental immunity under 42 Pa.C.S. §§ 8541–8542. However, the trial court granted the summary judgment motions based solely on the statute of limitations defense and did not address the other arguments the defendants raised. On appeal to this court, the appellees have not pursued those other arguments, with the exception of the Bachmans who argue that the decision should also be upheld on the basis of Graybill's allegations and his deposition testimony concerning the amount of water flowing from their property onto his.

granted the motions in favor of the defendants on all sixteen counts of Graybill's complaint.

The trial court perceived Graybill's complaint as alleging damage from inundation to his property as a result of the development of the neighboring lots in 1983, and concluded that in accordance with this court's decision in *Leggieri*, the statute of limitations began to run when the first trespass occurred or when it reasonably should have been discovered. After reviewing the record and the *Leggieri* decision, this court concludes we should overrule our decision in *Leggieri*. Accordingly, the trial court's decision must be reversed.

### 2. Permanent injury or continuing trespass

■ *Leggieri* relied on *Sustrik v. Jones & Laughlin Steel Corp.*, 413 Pa. 324, 197 A.2d 44 (1964), as a framework for analyzing when a particular injury to land should be characterized as a permanent injury or a continuing trespass. The allegations in this case are of occasional flooding caused by increased runoff and drainage onto the plaintiff's land resulting from the construction of houses on nearby higher land. A closer analysis of *Sustrik* does not lead to the conclusion that Graybill's allegations demonstrate a permanent change, as compared to a continuing trespass, as a matter of law so as to justify a grant of summary judgment.

In *Sustrik* the plaintiffs sought to recover damages from the adjacent landowner for, among other things, an unlawful trespass from an underground sewer line draining water from the defendant's mine across the plaintiffs' property to a nearby creek. The court held that the claim relating to the sewer line was barred by the statute of limitations, noting that the sewer had been installed more than forty years before the commencement of the suit. Referring to commentary from the Restatement of Torts § 162 (1939) that is similar to commentary now found in the Restatement (Second) of Torts (1965), the court rejected the plain-

tiffs' claim that the sewer line across their property constituted a continuing trespass.

The facts of *Sustrik* involved injury similar to the examples given in both Restatements for a trespass that causes a permanent change: an *entry* onto the land of another and an affirmative act, such as an excavation, producing a permanent change *to that land itself.* The allegations of the present case concern acts of construction by the defendant Findleys upon their *own* land. Those acts did not directly and immediately cause any injury to Graybill's land; rather, those acts, coupled with the effects of rainfall, allegedly resulted in *consequential* damage to Graybill. That distinction prevents the straightforward application of the Section 162 commentary to cases such as this.

The material facts of *Leggieri* are indistinguishable from those of the present case. In our view, *Leggieri* represents a misapplication of *Sustrik* and an incorrect analysis of cases involving overflow of water.

In the annotation, *When Statute of Limitation Commences to Run Against Damage from Overflow of Land Caused by Artificial Construction or Obstruction,* 5 A.L.R.2d 302 (1949), the annotator noted that courts have frequently stated that the subject under annotation is one "beset with extreme difficulties, on which the authorities are in greatest conflict and exhibit a good deal of confusion." *Id.* at 309–10 (footnotes omitted). Courts have uniformly based their holdings, concerning when the statute began to run, on the distinction between permanent change (sometimes called "original injury" or damage resulting from structures "necessarily injurious") versus continuing trespass (also referred to as "temporary", "transient" or "recurring" injury, *see id.* at 310). However, the cases reveal that determination of that question usually involves the close analysis of many factors.

Among the factors that courts have considered for this purpose are the closely related questions of the ascertainability or predictability of the injury involved (i.e., whether it is possible for the plaintiff to calculate all of his future

damages in one action), and the question of the regularity of the incidents of overflow (i.e., whether the incidents happen frequently and predictably or only intermittently).

In *Naylor v. Eagle,* 227 Ark. 1012, 303 S.W.2d 239 (1957), plaintiffs alleged continuing injury to cropland three miles upstream from the point where the defendant had obstructed the flow of a watercourse. The Supreme Court of Arkansas held that, if the nature of the structure causing the overflow is such that damage to the plaintiff must necessarily result, and the nature and extent of this damage may be reasonably ascertained and estimated at the time of its construction, then there can be but a single recovery, and the statute of limitations against such cause of action is set in motion on the completion of the obstruction. However, if it is known merely that damage is probable or that, even though some damage is certain, the nature and extent of that damage cannot reasonably be known and fairly estimated, but is only speculative and conjectural, then the statute of limitation does not begin to run until the injury occurs, and there may be as many successive recoveries as there are injuries.

In *Clawson v. Garrison,* 3 Kan.App.2d 188, 592 P.2d 117 (1979), a landowner had leveled and irrigated cropland that naturally drained onto neighboring land, increasing the runoff from that land onto the neighbor's. The landowner then created an obstruction in the form of an elevated roadway with culverts at the point where the water discharged onto the adjacent property, increasing the amount and the velocity of the discharged water. The court held that damage to the neighboring property was a temporary injury, because the flooding was an infrequent and virtually unpredictable occurrence, and the amount of both present and future damages could not reasonably be determined in a single action. The statute of limitations, the court determined, started to run at the time of each successive flow.

By considering the ascertainability of the plaintiff's damages, or the intermittent nature of the injury, we keep the focus of our analysis on the factor that the Restatement

commentary, quoted in *Sustrik*, regards as crucial, namely, the permanence of the change *to the physical condition of the plaintiff's land*, rather than on the permanence of the defendant's structure that allegedly causes the injury.

In *Archer v. J.S. Compton, Inc.*, 238 Iowa 1182, 30 N.W.2d 92 (1947), a plaintiff claimed damages for intermittent flooding of his land allegedly due to the defendant's construction of a dike along its side of a creek running between the properties. The Supreme Court of Iowa held that

> [T]he term 'permanent,' as here used, 'has reference not alone to the character of the structure or thing which produces the alleged injury, but also to the character of the injury produced by it. In other words, the structure or thing producing the injury may be as permanent and enduring as the hand of man can make it; yet if the resulting injury be temporary or intermittent, depending on future conditions which may or may not arise, the damages are continuing, and successive actions will lie for successive injuries.'

*Id.* at 1190–91, 30 N.W.2d at 96 (quoting *Harvey v. Mason City & Ft. Dodge Railway Co.*, 129 Iowa 465, 474, 105 N.W. 958, 961 (1906)).

In the present case, Graybill has not alleged, contrary to the assertion in Findleys' brief, that he suffers flooding after every rain. Rather, as his response to interrogatories from the Findleys indicates, he alleges fewer than ten incidents of flooding over a period of almost four years, each at a time when he believes that the amount of rainfall was over one inch. (Brief for Appellee Providence Township, Exhibit A.) Graybill has not alleged that the defendants' actions resulted in permanently submerging his land, or even that they caused such regular flooding as to have the same effect as submergence, causing him to abandon his house and to seek damages for its full value.

The damages that Graybill has enumerated include the replacement of appliances such as furnace, hot water heater and washer and dryer. In a single action to recover all

damages, past, present and future, it is impossible to calculate how many such replacements should be alleged. Under these facts, it is impossible to know exactly how many incidents of flooding would occur, and the severity of them. The effect of the holding in *Leggieri* is to compel a plaintiff to seek recovery in one action for future damages based on pure speculation, because of the intermittent and unpredictable nature of the injury involved. These cases assume that the construction of a permanent structure such as a house by a defendant on his own land necessarily creates a permanent change to the condition of the plaintiff's land, for which an accurate assessment of all damages is possible, without a close examination of the factual circumstances. Such a blanket assumption could have the effect of placing an impossible burden on a plaintiff.

### 3. Summary judgment on the Count against the Bachmans based upon Graybill's pleadings and deposition

■ Finally, we must address the Bachmans' contention that the trial court's grant of summary judgment on the counts against them should be affirmed because Graybill alleged damages caused by a substantial or unreasonable increase of the surface waters flowing from their property onto Graybill's, but stated in his deposition that the water flow from the Bachmans' property "didn't seem like a whole lot." (Deposition of Graybill, R. 94a–95a.)

The Bachmans rely upon the Pennsylvania Superior Court's decision in *Laform v. Bethlehem Township*, 346 Pa.Superior Ct. 512, 499 A.2d 1373 (1985) to support their argument. In that decision the Superior Court stated that

where the factors of artificial diversion or unreasonable or unnecessary increase are not present, a landowner is under no duty to tame the surface waters flowing over his land. Failure to control surface waters discharged through a natural channel as a result of ordinary and reasonable development of the land is not negligence.

The Bachmans point out that Graybill testified that when the first flooding occurred, they had not yet begun development of their land.

Thus, the Bachmans assert that, based on Graybill's pleadings and deposition, this court should conclude as a matter of law that they owed no duty to Graybill, and therefore were not negligent, because his statement is the equivalent of an admission that there was no unreasonable increase in water flow attributable to the Bachmans' development of their property.

Graybill's testimony indicates that, in his opinion, the water flow did increase as a result of the construction on the Bachmans' property. Although he indicated that the amount of water flowing from the property "didn't seem like a whole lot," this court cannot rely upon that statement to find that the water flow is not substantial or unreasonable. This court cannot reach a conclusion based on the Bachmans' characterization of Graybill's statement to establish that the flow was not unreasonable. Graybill's opinion is ambiguous and insufficient as a gauge of the legal reasonableness or unreasonableness of the increase of water flow from the Bachmans' property. Hence, with respect to Graybill's Counts against the Bachmans', we reverse the trial court.

Accordingly, with a commendation to the trial judge who astutely followed the precedent now subsequently overruled, the appealed order is reversed, and this case is remanded to the trial court for further proceedings.

## ORDER

NOW, June 24, 1991, the decision of the Court of Common Pleas of Lancaster County, dated January 17, 1990, at No. 4205 of 1987, is reversed and the case is remanded to the trial court for further proceedings.

Jurisdiction relinquished.

SMITH, Judge, dissenting.

I dissent from the majority decision to the extent it reverses the trial court and holds that Graybill's claims against the Findleys and the Township which accrued in 1983 are not barred by the two-year statute of limitations. The essential issue here is whether development of the Findleys' lot by 1983 without provision for proper drainage of surface water as alleged, effected a permanent physical change in the condition of Graybill's land or whether the injuries sustained by Graybill can be characterized as separate and recurrent to support a continuing trespass theory. To reverse the trial court, the majority develops an analysis heretofore never recognized in this jurisdiction and relies upon cases from other states to overrule the sound decision entered by this Court in *Leggieri v. Township of Haverford,* 98 Pa.Commonwealth Ct. 646, 511 A.2d 955 (1986).

## I

The concept of a "continuing trespass" is defined under the Restatement (Second) of Torts § 161, comment b. (1965) which provides:

The actor's failure to remove from land in the possession of another a structure, chattel or other thing which he has tortiously erected or placed on the land constitutes a continuing trespass for the entire time during which the thing is wrongfully on the land and ... confers on the possessor of the land an option to maintain a succession of actions based on the theory of continuing trespass or to treat the continuance of the thing on the land as an aggravation of the original trespass.

A "permanent trespass" is defined by the Restatement (Second) of Torts § 162, comment e. (1965) as follows:

A continuing trespass must be distinguished from a trespass which permanently changes the physical condition of the land. Thus, if one, without a privilege to do so, enters land of which another is in possession and destroys or removes a structure standing upon the land, or digs a

well or makes some other excavation or removes earth or some other substance from the land, the fact that the harm thus occasioned on the land is a continuing harm does not subject the actor to liability for a continuing trespass. Since his conduct has once [and] for all produced a permanent injury to the land, the possessor's right is to [a] full redress in a single action for the trespass, and a subsequent transferee of the land, as such, acquires no cause of action for the alteration of the condition of the land.

Pennsylvania courts have adopted the above definitions. *See Mancia v. Department of Transportation,* 102 Pa.Commonwealth Ct. 279, 517 A.2d 1381 (1986); *County of Allegheny v. Merrit Construction Co.,* 309 Pa.Superior Ct. 1, 454 A.2d 1051 (1982).

In *Leggieri,* this Court found a permanent trespass under facts similar to the case *sub judice.* The Leggieris experienced surface water runoff from an adjacent house, constructed on a hill in 1979, during rains beginning in 1980. In 1984, more than two years from the first occurrence of flooding, the Leggieris filed an action against the township alleging that it was negligent in approving the developer's subdivision plan with an improperly designed water drainage system. The trial court granted the township's motion for summary judgment on the basis of the statute of limitations defense. The Leggieris argued that the flow of water onto their property was a continuing trespass causing a new trespass and new injury to them with each heavy rain. This Court, however, found a permanent change in the condition of the land and held that the two-year statute of limitations began to run from the time of the original trespass, relying upon *Sustrik v. Jones & Laughlin Steel Corp.,* 413 Pa. 324, 328, 197 A.2d 44, 46–47 (1964), which held:

[A] continuing trespass must be distinguished from a trespass that effects a permanent change in the condition of the land. The latter, while resulting in a continuing harm, does not subject the trespasser to liability for a

continuing trespass.... If a nuisance at the time of creation is a permanent one, the consequences of which in the normal course of things will continue indefinitely, there can be but a single action therefor to recover past and future damages *and the statute of limitations runs against such cause of action from the time it first occurred,* or at least from the date it should reasonably have been discovered. (Citations omitted; emphasis added.)

*See also Canfield Appeal,* 83 Pa.Commonwealth Ct. 76, 476 A.2d 489 (1984) (the statute of limitations runs from the first time a particular dam spilled or at least from the time it should reasonably have been discovered); *Mancia* (cause of action due to drainage of water as a result of improper replacement of a drainage pipe accrued when trespass first occurred as drainage caused permanent change in the adjoining land); *Merrit Construction* (landslide caused by excavation results in a permanent trespass).

Therefore, under the record developed in the matter *sub judice* and according to precedent, a permanent change occurred in 1983 from the completion of construction on the Findleys' lots or when Graybill experienced the first flooding. Since there was a permanent change in Graybill's property, the statute of limitations began to run in 1983. *Leggieri; Sustrik.* Consequently, Graybill's action against the Findleys must be barred as untimely filed, and the trial court's decision granting summary judgment in favor of the Findleys on counts 1 through 4, 7 and 8 and in favor of the Township on counts 13 and 14 must be affirmed.

## II

The majority concludes that the decision of this Court in *Leggieri* must be overruled because it represents "a misapplication of *Sustrik* and an incorrect analysis of cases involving overflow of water." 140 Pa.Commonwealth Ct. at 510, 593 A.2d at 1316. The majority further concludes that since *Sustrik,* unlike the case *sub judice,* involved the defendant's entry onto the plaintiff's land and installation

of an underground sewer line causing injuries to the plaintiff's land itself, *Sustrik* may not be relied upon in determining whether a permanent change occurred to Graybill's land. According to the majority, the Findleys' construction on their own land therefore did not directly and immediately cause injuries to Graybill's land. In other words, there must be an entry onto the plaintiff's land to find a permanent injury. Such a conclusion is neither supported by the case law of this Commonwealth nor the Restatement (Second) of Torts. Section 161 of the Restatement (Second) of Torts defines a continuing trespass as a "failure to remove from land in the possession of another a structure, chattel or other thing which he has tortiously erected or placed on the land...." Thus, to follow the majority's logic, the alleged facts in this case would negate a finding of continuing trespass as well since the harm to Graybill's land did not involve a failure to remove from Graybill's property any structure, chattel or other thing which the Findleys "tortiously erected or placed" on Graybill's land. The record as developed unequivocally falls outside the concept of continuing trespass.

In *Piccolini v. Simon's Wrecking*, 686 F.Supp. 1063 (M.D.Pa.1988), the plaintiff alleged that the defendant, by operating a landfill, had seriously contaminated the plaintiff's land resulting in, among other things, increased runoff of surface water and soil erosion in plaintiff's property. Even though the facts did not involve defendant's direct physical entry onto the plaintiff's land, the court in *Piccolini* did not view such fact as dispositive of whether there was a permanent as opposed to continuing trespass to the land. In the matter *sub judice*, however, the majority unfortunately focuses upon the factual distinctions between *Sustrik* and the present case rather than on the effects of the Findleys' development on the physical condition of Graybill's land.

## III

The majority has determined that Graybill's allegations of occasional flooding and "consequential" damages are insuf-

ficient to establish a permanent change and that there must be some allegation "that the [Findleys'] actions resulted in permanently submerging [Graybill's] land, or even that they caused such regular flooding as to have the same effect as submergence, causing him to abandon his house and to seek damages for its full value." 140 Pa.Commonwealth Ct. at 512, 593 A.2d at 1317. Nothing in the law compels this interpretation.

Nonetheless, Graybill alleges more than occasional flooding and "consequential" damages. In his complaint, Graybill sets forth the defendants' alleged negligence as follows:

19. Prior to Findley's subdivision, the natural flow of surface water never flowed over the banks of the waterway onto Plaintiff's property or flooded Plaintiff's home.

20. Since the time Findley subdivided the property and continuing to the present time, the quantity of water flowing upon Plaintiff's land has been substantially and unreasonably increased causing water to enter the basement of Plaintiff's dwelling and causing the flooding of the undeveloped land making Plaintiff's property unfit for habitation and causing damage.

21. Findley as the former owner and subdivider of the property identified in paragraph 8 and shown on Exhibit 'A' had a duty not to unreasonably or unnecessarily change the quantity or quality of surface water flowing across Plaintiff's land.

22. Findley failed to provide for effective drainage of surface water when subdividing the property.

23. The continuing inundation of Plaintiff's property is believed and therefore averred to be originating from surface water flowing from the subdivided land.

Graybill seeks, in addition to damages for various appliances and repair costs from two separate floodings, the decrease in the fair market value of his house which would include the other damages the majority characterizes as "consequential." If the majority view prevails, does this mean that Graybill's claims for damages including the decrease in the fair market value of his house will be allowed

every time he alleges damages short of "permanent submergence" of his land? This view will undoubtedly lead to endless litigation between the parties and will be extremely unjust to unsuspecting potential defendants. *Merrit Construction. See also Miller v. C.P. Centers, Inc.*, 334 Pa.Superior Ct. 623, 483 A.2d 912 (1984) (measure of damages for injury to property is cost of repairs where that injury is repairable; however, where injury is characterized as permanent, measure of damages becomes the decline in the fair market value of the property). Thus, as the *Piccolini* court observed, "where all damages, both past and future, can be presently estimated and recovered in one action, successive actions cannot be brought for recurring or continuing damages and the Statute runs from the time the original cause of action accrues." *Id.*, 686 F.Supp. at 1073.

## IV

In determining whether surface water runoff creates a continuing trespass or permanent change to property, the majority adopts a new analysis based upon ascertainability of future damages or predictability of injury to be determined by reviewing allegations set forth in the complaint. The majority relies upon *Clawson v. Garrison*, 3 Kan. App.2d 188, 592 P.2d 117 (1979); *Naylor v. Eagle*, 227 Ark. 1012, 303 S.W.2d 239 (1957); and *Archer v. J.S. Compton, Inc.*, 238 Iowa 1182, 30 N.W.2d 92 (1947). While decisions from other jurisdictions are not controlling in Pennsylvania, and the cases relied upon by the majority do not support overruling *Leggieri*, I conclude however that even under the new analysis adopted by the majority, there was a permanent change in the physical condition of Graybill's land.

The majority states that it would be impossible for Graybill to calculate all past, present and future damages in a single action because of the intermittent and unpredictable nature of the injury involved. I disagree. In *Clawson*, the court held that if an injury is permanent or if the causative structure or condition is of such a character that injury will

inevitably result, and the amount of damages can be determined or estimated, a single action for both past and future damages should be brought. The Kansas court, after noting that not all of the Kansas authority was in harmony and that each case must be decided on its own facts, concluded the evidence demonstrated that flooding was infrequent and virtually an unpredictable occurrence. The court cited another Kansas case where the evidence showed that the plaintiff's land had been flooded only twice in the last twenty-four years.[1] Moreover, assessment of damages in a single action is for the fact finder and its difficulty should not be a controlling factor in determining the nature of the trespass. Difficulty in assessing future damages is present in other proceedings as well. *See, i.e., Baccare v. Mennella*, 246 Pa.Superior Ct. 53, 369 A.2d 806 (1976) (in personal injury cases, jury may reasonably infer from evidence what probable future consequences of injury will be and award damages accordingly).

Graybill asserts that he did not have a surface water runoff problem prior to the Findleys' development and that he experienced the first flooding of his property in the fall of 1983 and every year thereafter: May/June, 1984;

1. Further, neither *Naylor* nor *Archer* supports the majority's position. In *Naylor,* the owner of farmland located three miles upstream and north of a dam claimed damages allegedly caused by overflowing backwaters from the dam. The Arkansas court stated that if the certainty, nature and extent of this damage may be reasonably ascertained and estimated at the time of construction, then the damage is original and there can be but a single recovery, and that the statute of limitations is set in motion on the completion of the construction. *Naylor,* however, concluded that the preponderance of the evidence showed the nature and extent of the damages could not be reasonably known and estimated at the time the dam was built based upon the defendant's testimony that he did not know whether installation of the spillway would cause damage to Naylor's land and the fact that after the dam was built, the weather had been unusually dry and the rainfall insufficient to test the flooding effect of the dam. Although the Iowa court in *Archer* observed apparent confusion and inconsistency in Iowa authority on the subject, it found defendant's damages in that case continuing and not permanent in character because the evidence showed that the ditch was probably adequate in ordinary times to carry the normal flow of water, but inadequate only in times of flood and high water.

July/August, 1985; September, 1986; May, 1987; July 10, 1987; July 4, 1987. He further stated that the surface water runoff problem worsened each year. Graybill's Answers to Findleys' Interrogatories, Nos. 5–6. In light of these undisputed facts, the majority cannot validly dispute that flooding of Graybill's property was a predictable or regular event. Thus, applying the majority's new approach, there was clearly a permanent change in Graybill's property caused by the Findleys' development inasmuch as the alleged flooding occurred with frequency and predictability allowing for calculation of damages in a single action.

Further examination of decisions in other jurisdictions in the area of trespass to real property merely demonstrates that the law is unsettled. For example, the Federal District Court in *Dobbs v. Missouri Pacific Railroad Co.*, 416 F.Supp. 5 (E.D.Okla.1975), reviewed Oklahoma law and stated that a cause of action based upon trespass to real property caused by the construction of permanent improvements on other property accrues under the following circumstances:

> Where a trespass is the natural result of, or obviously consequential from, the construction of a permanent improvement, the cause of action arising from a resulting trespass accrues upon the construction of the improvement, and in an action for that trespass an aggrieved landowner must recover for all damages which he has or will thereby sustain. Where a trespass is not the natural result of, or obviously consequential from the construction of a permanent improvement, a cause of action arising from a resulting trespass does not accrue until a specific trespass occurs, or a specific injury is sustained, and in an action for that trespass an aggrieved landowner may recover for injuries which he has already sustained, and he may bring as many successive actions as there are successive injuries.

*Id.*, 416 F.Supp. at 8. For a similar position taken in other jurisdictions, *see also Baskett v. United States*, 8 Cl.Ct. 201 (1985), *aff'd*, 790 F.2d 93 (Fed.Cir.1986), *cert. denied*, 478

U.S. 1006, 106 S.Ct. 3300, 92 L.Ed.2d 714 (1986); and *Carbo v. Hart,* 459 So.2d 1228 (La.App. 1st Cir.1984), *cert. denied,* 462 So.2d 654 (La.1985). In view of the unsettled and contrasting positions taken by courts in deciding the question of permanent versus continuing trespass to land, I seriously question the wisdom of this Court in overruling *Leggieri* which appropriately follows *Sustrik* and the law of this Commonwealth.

PALLADINO, J., joins in this dissent.